576 S.E.2d 796

Aaron ELLIOTT, Plaintiff
Below, Appellant,

v.

Chris SCHOOLCRAFT; James Roger
House, II, also known as J.R. House;
Nancy House; James Roger House;
Joshua Haynes; Glenn Haynes; Patricia
Haynes; and the Board of Education of
the County of Kanawha, a West Virginia
corporation, Defendants Below, Appel-
lees.

No. 30431.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 18, 2002.

Decided Nov. 18, 2002.

Concurring and Dissenting Opinion of
Chief Justice Davis Dec. 6, 2002.

Concurring Opinion of Justice
Starcher Dec. 10, 2002.

C. Michael Bee, Esq., Sandra Brenneman Harrah, Esq., Hill, Peterson, Carper, Bee & Dietzler, P.L.L.C., Charleston, West Virginia, Attorneys for the Appellant.

Mark A. Atkinson, Esq., John J. Polak, Esq., Timbera C. Wilcox, Esq., Rose & Atkinson, Charleston, West Virginia, Attorneys for Appellees James Roger House, II, Nancy House, and James Roger House.

Wendy E. Greve, Esq., Pullin, Knopf, Fowler & Flanagan, P.L.L.C., Charleston, West Virginia, Attorneys for Appellees Joshua Haynes, Glen Haynes, and Patricia Haynes.

Ancil G. Ramey, Esq., Jan L. Fox, Esq., Michelle E. Piziak, Esq., Steptoe & Johnson, P.L.L.C., Charleston, West Virginia, Attorneys for Appellee Board of Education of the County of Kanawha.

PER CURIAM:

In this appeal from the Circuit Court of Kanawha County, we are asked to review four orders granting summary judgment to several appellees. In each order, the appellant contends that the circuit court abused its discretion by granting summary judgment before the appellant was allowed to conduct discovery of facts necessary to oppose the appellees' motions for summary judgment.

As set forth below, we agree and reverse the circuit court's orders.

### I.

The appellant, Aaron Elliott, was a senior at Nitro High School on December 5, 1998. On that day, Nitro High School won the state championship football game.

Appellee James Roger House, II ("J. R. House"), who was eighteen years old at the time and the team quarterback, hosted a "victory party" for high school students at an empty house he owned. J.R. House, along with his parents, appellees Nancy and James Roger House, lived in a home adjacent to the property where the "victory party" was to be held.

It appears from the record that alcoholic beverages, including beer, were served, sold (for $2.00 a cup), and consumed by many of the high school students at the party on J.R. House's property. Nancy House, along with other members of the House family, may have been supervising the party at the empty house, may have cleaned up empty cups, and may have allowed party attendees to use the restroom next door in the family house.

Appellees Glenn and Patricia Haynes also owned a home adjacent to the empty house where the party was held. Their son, appellee Joshua Haynes, who was then also eigh-

teen years old, had several friends visiting the Haynes house that evening. Joshua Haynes and his friends, including defendant below Chris Schoolcraft, migrated next door to J.R. House's "victory party."

Witnesses allege that, while at the party, Joshua Haynes and Chris Schoolcraft consumed substantial amounts of beer. One witness testified in a deposition that both Joshua Haynes and Chris Schoolcraft performed "keg stands," and were held upside down drinking from a running beer keg tap. At some point, Joshua Haynes and Chris Schoolcraft returned to the Haynes property.

Appellant Aaron Elliott arrived at the party in the late evening, and after being at the party for 20–45 minutes, decided to leave. As he walked by the Haynes property, the appellant claims he saw J.R. House and stepped onto the Haynes property to congratulate him. Appellee Joshua Haynes immediately yelled for the appellant to leave his property, and after that began debating with Chris Schoolcraft as to who of the two was going to beat up the appellant. Chris Schoolcraft then hit the appellant in the jaw with his fist, and the appellant collapsed to the ground. Evidence revealed during the discovery process suggests that both Joshua Haynes and Chris Schoolcraft proceeded to kick the appellant as he lay on the ground.[1]

The appellant was severely injured, and was diagnosed with a broken jaw which required his mouth be wired shut for six months. The appellant also sustained a back injury. He has incurred medical expenses in excess of $16,000.00.

On December 3, 1999, the appellant filed a complaint against various individuals seeking to recover compensation for his injuries. To begin, the appellant sued Chris Schoolcraft, who never answered the appellant's complaint. A default judgment was later entered against Mr. Schoolcraft by the circuit court, and he is not participating in the instant appeal.

The appellant also filed the instant lawsuit against J.R. House and his parents, Nancy and Roger House. The appellant contends that the Houses violated *W.Va.Code*, 11–16–19 [1993], which prohibits any person under the age of 21 from "purchas[ing], consum[ing], sell[ing], possess[ing] or serv[ing] nonintoxicating beer," and prohibits a person from giving or furnishing nonintoxicating beer to anyone under the age of 21. The legislatively-stated purpose of this statute is:

> ... for the protection of the public safety, welfare, health, peace and morals and [is] further intended to eliminate, or to minimize to the extent practicable, the evils attendant to the unregulated, unlicensed and unlawful ... sale, distribution ... and consumption of such beverages[.]

*W.Va.Code*, 11–16–2 [1986]. The appellant alleged that the Houses, by furnishing, selling, and promoting the consumption of alcoholic beverages by and to high-school-aged students, negligently contributed to the intoxication of Joshua Haynes and Chris Schoolcraft, and that the intoxication was a direct and proximate cause of an "evil" attendant to such activity, the appellant's injuries.

The appellant also filed the instant lawsuit against Joshua Haynes and his parents, Glenn and Patricia Haynes. The appellant alleged that Joshua Haynes' parents were negligent in allowing their son and his high-school-aged friends to gather and consume alcoholic beverages on their property, and that they failed in their duty to deter underage drinking. As a result of the testimony of a witness during discovery, the appellant later alleged that Joshua Haynes was liable for kicking the appellant as he lay on the ground.

Lastly, the appellant sued the Board of Education of Kanawha County ("the Board"). The appellant states that *W.Va.Code*, 18–2–25 [2000] places a duty on boards of education to exercise control, supervision, and regulation of all extracurricular activities. The appellant contended that the "victory party," because of its connection with the state high school football championship, was such an extracurricular activity. The appel-

---

1. As detailed *infra,* the allegation that Joshua Haynes actually kicked the appellant was not discovered until witness depositions were able to be conducted, approximately one month after the circuit court indicated it would grant summary judgment to Joshua Haynes and his parents.

lant alleges that teachers at the school knew of the party beforehand, and that several coaches even attended the party and drank alcoholic beverages with students. The appellant argues that the Board had a duty to intervene and prevent students from drinking alcoholic beverages.

When the appellant filed his complaint in December 1999, he also filed a motion seeking a scheduling conference before the circuit court. The parties commenced trading written discovery, and a scheduling conference was planned for March 22, 2000. However, on March 13, 2000, appellees Nancy and James Roger House filed a motion for summary judgment, and the scheduling conference was moved to April 28, 2000. Appellees Joshua, Glenn and Patricia Haynes similarly filed a motion for summary judgment on April 21, 2000.

On April 25, 2000, the appellant filed notices to take the depositions of the parties and several witnesses, beginning on June 1, 2000. The appellant indicated, before the circuit court, that because of the popularity of J.R. House, depositions were necessary to secure the statements of witnesses unwilling to talk informally with appellant's counsel. However, upon filing the notices of deposition, the appellant learned that several witnesses—including Chris Schoolcraft and Joshua Haynes—lived in South Carolina and were not subject to a West Virginia subpoena. Furthermore, counsel for the other parties—namely the Houses—refused to produce their clients for deposition.

At the April 28, 2000 hearing, counsel for the appellant indicated that the hearing was requested primarily as a scheduling conference to obtain a trial date and to "get the discovery moving along." The appellant also repeatedly indicated to the circuit court—orally and in pleadings—that discovery was still ongoing, and would be needed to respond to the appellees' motions. Still, at the hearing on April 28, 2000, the circuit court announced it would grant summary judgment to appellees Nancy and Roger House, and

Joshua, Glenn and Patricia Haynes. The circuit court concluded that no genuine issue of material fact existed to establish a breach of any duty by these appellees, and dismissed the appellant's claims.[2]

On May 17, 2000, appellee J.R. House filed a motion for summary judgment. The Board filed a motion for summary judgment on June 6, 2000. At a hearing on June 16, 2000, the circuit court again refused the appellant's request to delay consideration of the motions, and granted both motions for summary judgment.[3]

The appellant subsequently filed motions to reconsider or alter the circuit court's summary judgment orders. The circuit court refused to consider the evidence discovered in the few depositions that the appellant was able to conduct in June 2000, such as the testimony that Joshua Haynes had actually participated in kicking appellant Aaron Elliott. The circuit court concluded that its summary judgment orders "were sound and based on the facts and law before it at that time[.]" In an order dated April 17, 2001, the circuit court denied the appellant's motions to alter the summary judgment orders.

The appellant now appeals the circuit court's orders.

## II.

■ We review a circuit court's grant of summary judgment *de novo*. Syllabus Point 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

The appellant contends that the circuit court "jumped the gun," and granted summary judgment to the appellees before substantial discovery could be completed. The appellant, orally and in writings, repeatedly requested that the circuit court delay ruling on the motions for summary judgment until discovery, particularly the depositions of the parties and eyewitnesses to the incident, could be conducted. The appellant essentially argues that the circuit court abused its

---

2. The order granting summary judgment to Nancy and James Roger House is dated June 1, 2000, while the Haynes' summary judgment order is dated July 7, 2000.

3. The order granting summary judgment to the Board is dated September 7, 2000, while the J.R. House order is dated November 21, 2000.

discretion in considering the motions for summary judgment.

 As a general rule, summary judgment is appropriate only after the parties have had adequate time to conduct discovery. As we stated in *Powderidge Unit Owners Ass'n v. Highland Properties, Ltd.*, 196 W.Va. 692, 701, 474 S.E.2d 872, 881 (1996):

> As a general rule, summary judgment is appropriate only after adequate time for discovery. See *Celotex [Corp. v. Catrett ]*, 477 U.S. [317] at 322, 106 S.Ct. [2548] at 2552, 91 L.Ed.2d [265] at 276 [ (1986) ]. A party opposing a motion for summary judgment must have a reasonable "opportunity to discover information that is essential to [its] opposition" to the motion. *See Anderson [v. Liberty Lobby, Inc.]*, 477 U.S. [242] at 250 n. 5, 106 S.Ct. [2505] at 2511 n. 5, 91 L.Ed.2d [202] at 213 n. 5 [ (1986) ]. In *Board of Education of the County of Ohio [v. Van Buren and Firestone, Architects, Inc.]*, 165 W.Va. [140] at 144, 267 S.E.2d [440] at 443 [ (1980) ], we stated that granting a motion for summary judgment before the completion of discovery is "precipitous."

We went on to hold in *Powderidge* that a circuit court, within its discretion, could delay consideration of a summary judgment motion when a party files, in accordance with Rule 56(f) of the *Rules of Civil Procedure*,[4] an affidavit or some "alternative statement" indicating that additional time was needed to discover facts necessary to oppose a motion for summary judgment. We stated the following rule in Syllabus Point 1 of *Powderidge:*

> An opponent of a summary judgment motion requesting a continuance for further discovery need not follow the exact letter of Rule 56(f) of the West Virginia Rules of Civil Procedure in order to obtain it. When a departure from the rule occurs, it should be made in written form

and in a timely manner. The statement must be made, if not by affidavit, in some authoritative manner by the party under penalty of perjury or by written representations of counsel. At a minimum, the party making an informal Rule 56(f) motion must satisfy four requirements. It should (1) articulate some plausible basis for the party's belief that specified "discoverable" material facts likely exist which have not yet become accessible to the party; (2) demonstrate some realistic prospect that the material facts can be obtained within a reasonable additional time period; (3) demonstrate that the material facts will, if obtained, suffice to engender an issue both genuine and material; and (4) demonstrate good cause for failure to have conducted the discovery earlier.

We stated, in explaining the application of Rule 56(f):

> Under Rule 56(f), a procedural "escape hatch" is provided for a party who genuinely requires additional time to marshal material facts to contest a summary judgment motion.... However, invocation of Rule 56(f) does not demand hypertechnical compliance with its terms. In appropriate surroundings, some alternative statement might serve. Indeed, some cases have accepted a nonaffidavit pleading—a letter— as sufficient under Rule 56(f).

*Powderidge*, 196 W.Va. at 701, 474 S.E.2d at 881.

 In the instant case, the record indicates that the parties had only exchanged written discovery requests before motions for summary judgment were filed. Notwithstanding the incompleteness of the development of a factual record, the appellees began filing motions for summary judgment four months after the lawsuit was initiated, and before the circuit court considered the appellant's motion for the entry of a scheduling order.[5]

---

**4.** Rule 56(f) of the *Rules of Civil Procedure* states:

(f) When Affidavits Are Unavailable. Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may

order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

**5.** Our inspection of the record reveals that the circuit court never entered a scheduling order in the instant case. Rule 16(b) of the *Rules of Civil*

Applying our four-point holding in *Powderidge*, the record reveals that the appellant articulated to the circuit court a plausible basis that material facts were discoverable, but were not accessible to the appellant. The appellant had scheduled depositions of the parties in what is clearly a fact-intensive case, yet counsel for several parties refused to produce their clients for deposition before the circuit court considered their motions for summary judgment. The appellant also demonstrated a realistic prospect that material facts could have been obtained within a reasonable additional time period. Depositions of the parties were highly likely to engender a genuine and material issue of fact. And lastly, "good cause" for the appellant's "failure to have conducted discovery earlier" was shown by the fact the appellees began filing motions for summary judgment only four months after a complex lawsuit with multiple parties was filed, even before depositions of the parties could be taken.

The record establishes that the appellant simply was not given an opportunity to conduct sufficient formal discovery of his case and, consequently, could not adequately respond to the appellees' motions for summary judgment. The record also establishes that this was made known, orally and in pleadings, to the circuit court. The circuit court therefore abused its discretion by ruling on the appellees' motions for summary judgment.

### III.

The circuit court's orders granting summary judgment are reversed, and the case is remanded for further proceedings.

Reversed and Remanded.

---

*Procedure* requires the entry of a scheduling order, and states (with emphasis added):
 ... [T]he judge *shall*, after consulting with the attorneys for the parties and any unrepresented parties, by a scheduling conference, telephone, mail or other suitable means, enter a scheduling order that limits the time:
 (1) To join other parties and to amend the pleadings;
 (2) To file and hear motions; and
 (3) To complete discovery.

STARCHER, Justice, concurring:

(Filed Dec. 10, 2002)

I write separately to emphasize the majority opinion's conclusion that the circuit court in the instant case "jumped the gun" in granting summary judgment. The appellant, Aaron Elliott, was forced to defend multiple summary judgment motions in the absence of a factual record, without the benefit of discovery. The circuit court should not have granted summary judgment, and should have allowed the parties to develop evidence of what really happened, before, during and after the December 5, 1998 "victory party."

The discovery that the appellant was able to conduct—such as the handful of depositions that were completed—suggest that J.R. House routinely had parties at his house, and that alcohol was served at those parties. (For reasons that are unknown, J.R. House's parents inherited the house from a family member, but had the house titled his name. The appellant never discovered who paid the taxes, insurance, or other costs of operating the house.) Nancy House, the mother of J. R., was apparently supervising the victory party in some capacity, and appears to have drafted one of J.R. House's older siblings to assist.

Because these parties were routine, *some* school board employees had warned *some* students not to attend the parties. The record contains an instance where a teacher, who was also the cheerleading coach, disciplined several cheerleaders who went to one party and drank alcohol, and later warned the cheerleaders they would face consequences if they drank any alcohol at the victory party. This is not to say that all school board employees disapproved of the parties. The record also contains evidence that at least two football coaches attended

---

The scheduling order also may include:
 (4) The date or dates for conferences before trial, a final pretrial conference, and trial; and
 (5) Any other matters appropriate in the circumstances of the case.
 A schedule shall not be modified except by leave of the judge.
The appellant asserts that the circuit court should have entered a scheduling order before considering the motions for summary judgment. We agree.

the victory party, one of whom allegedly drank to the point he was slurring words and having difficulty standing. There is some suggestion that the December 5 "victory party" was widely known and talked about at Nitro High School, but to what extent school employees and administrators encouraged or supported or discouraged the event is unknown because of the hasty granting of summary judgment.

The circuit court granted summary judgment to Joshua Haynes and his parents because, at the time the judgment was granted, there was no evidence of any wrongdoing by these parties. However, several weeks after summary judgment was granted, a deponent identified Joshua Haynes as one of the appellant's attackers. The deponent saw Joshua Haynes—who had allegedly been drinking heavily in violation of West Virginia law—kicking the appellant as he lay in the Haynes' front yard.

As I read the sparse factual record, one might infer that Glenn and Patricia Haynes knowingly encouraged and/or allowed their son and his friends to drink a few brews on their property. There are suggestions in the record that Joshua Haynes and his friends began drinking at 1:30 in the afternoon at the Haynes' house, long before the victory party began.[1] Unfortunately, the record suggests that the appellant was unable to take the deposition of Joshua Haynes, Chris Schoolcraft (the person who initiated the attack) or most of the other individuals who were at the Haynes' house that evening to clarify the events leading up to the attack.

The record establishes that the appellant filed his complaint one year after the attack in December 1999. The appellees filed their

answers a month later and the parties traded written discovery. The circuit court—which is bound under Rule 16 of the *Rules of Civil Procedure* to enter a pre-trial scheduling order—never entered a scheduling order.

Accordingly, the appellant scheduled a hearing—that was ultimately held on April 28, 2000—with the circuit court to establish a discovery schedule and a deadline for filing such things as motions for summary judgment. Appellees Nancy and Roger House filed a motion for summary judgment, and converted appellant's scheduling hearing into a summary judgment hearing. Joshua, Glenn and Patricia Haynes filed their own motion for summary judgment seven days before the hearing,[2] even though such motions are supposed to be filed at least ten days before a hearing. *See* Rule 56(c), *Rules of Civil Procedure* ("The motion shall be served at least 10 days before the time fixed for the hearing."). The Haynes even supplemented their motion with affidavits, their primary evidence, four days before the hearing.

The appellant's attorney appeared at the hearing and told the circuit judge that additional time was needed for discovery to respond to the appellees' motions and affidavits. The circuit judge was clearly and repeatedly told that depositions had already been scheduled for approximately six weeks in the future. The circuit judge instead concluded there were no facts in dispute, and granted summary judgment anyway.

The remaining two appellees, J.R. House and the Board of Education, jumped on the bandwagon and filed their motions for summary judgment soon after the April 28, 2000 hearing.[3] And, in the midst of the appel-

---

1. Joshua Haynes and his friends were so inebriated that night that when appellant Aaron Elliott's parents arrived after the attack and demanded to talk to Glenn and Patricia Haynes, Joshua and his friends threatened to beat them up as well. Glenn and Patricia Haynes claim no knowledge of this event, and contend they arrived home after a Christmas party and, feeling ill, went directly to bed.

2. The appellant's attorney asserts that the motion was filed after 5:00 p.m. on Good Friday.

3. To be more specific, at the April 28, 2000 hearing, the circuit court all but encouraged the

remaining appellees to file motions for summary judgment. For instance, the circuit court refused to order the remaining appellees to participate in mediation, telling the appellant's counsel "you don't have enough evidence" and because "there is not enough facts known." The circuit court stated that, "If what [the remaining two appellees are] saying is correct because of the ... motions that are going to be filed for summary judgement [sic], I'm just going to hold off on mediation and just wait until after we hear the motions[.]"

lant's depositions, the circuit court held a hearing and granted summary judgment to these parties as well.

This case started and ended in just over six months, before any meaningful discovery could be conducted. The record even suggests that some of the appellees' attorneys refused to allow the appellant to take their clients' depositions until after the circuit court ruled on the motions for summary judgment. In sum, the appellant was denied discovery, and then summary judgment was granted because the appellant had no evidence to prove his case.

My dissenting colleagues suggest that the Board of Education absolutely, plainly and definitely had no legal duty in this case because the Board of Education did not organize the party, did not transport students to the party, and did not allow the party to occur on school property during school hours. The record, however, contains absolutely no evidence regarding these factors—the appellant simply was not given a chance to conduct sufficient discovery of these issues. Perchance, a deposition of a school employee might reveal encouragement or active support for the victory party by school employees, employees who might have been acting in the course of their employment and not merely for their private pleasure.[4]

The existing record makes clear that school officials were aware of the routine victory parties at J. R.'s house and that students had been disciplined for attending those parties. So, if some students could be punished for attending an event not organized by the school, that was not on school property during school hours, then what was to prevent the school from acting to prevent all students from attending the victory party on December 5, 1998?[5] A simple phone call to the police by the school principal, or one of the coaches at the party, might have prevented the attack on the appellant.

I agree with my dissenting colleagues to the extent they suggest the appellant has a tough case to prove the Board of Education had a legal duty and breached that duty. However, the question of whether a party has a legal duty to do or refrain from some act cannot be answered in a factual vacuum. For the circuit court to say that the appellant didn't have a case against the Board of Education or any of the other appellees, in the absence of factual discovery, violated all notions of fairness. The majority was absolutely correct in stating that the circuit court "jumped the gun" in granting *all* appellees' motions for summary judgment without first permitting appellant sufficient time to do proper discovery in this case.

I therefore respectfully concur with the majority opinion.

DAVIS, Chief Justice, concurring, in part, and dissenting, in part:

(Filed Dec. 6, 2002)

While I otherwise concur in the Court's opinion, I must respectfully dissent from its conclusion that summary judgment in favor of the Kanawha County Board of Education (hereinafter "the Board") was improper. Mr. Elliott seeks to impose liability on the Board for an assault occurring on private property, after school-hours, during a non-school related event. There simply is no duty devolving on the Board in such circumstances. As such, the circuit court properly awarded summary judgment to the Board.

A. *No Action for Negligence Can Be Maintained in the Absence of a Legal Duty and the Question of the Existence of a Legal Duty is a Question of Law Appropriately Resolved in a Motion for Summary Judgment*

1. No action for negligence can be maintained in the absence of a legal duty. This Court has stated:

---

**4.** For instance, what if a coach announced, during the championship football game, that after the team won its championship, they all should get together at the "victory party." And, everyone knew where the "victory parties" had been routinely held. And, that the coach said, "I'll be there celebrating with you." Would it be reasonable to say, on these facts, that the coach's con-

duct was in the course of his employment? Would it be an act for which a board of education might bear legal responsibility?

**5.** We also cannot discern from the record whether the school employees who attended the party were disciplined.

" 'In order to establish a *prima facie* case of negligence in West Virginia, it must be shown that the defendant has been guilty of some act or omission in violation of a duty owed to the plaintiff. No action for negligence will lie without a duty broken.' Syl. pt. 1, *Parsley v. General Motors Acceptance Corp.*, 167 W.Va. 866, 280 S.E.2d 703 (1981)." Syl. pt. 4, *Jack v. Fritts*, 193 W.Va. 494, 457 S.E.2d 431 (1995).

Syl. pt. 3, *Aikens v. Debow*, 208 W.Va. 486, 541 S.E.2d 576 (2000). *See also Hinkle v. Martin*, 163 W.Va. 482, 486, 256 S.E.2d 768, 770 (1979) ("It is axiomatic that to establish a *prima facie* case of negligence in West Virginia, it must be shown that the defendant has been guilty of some act or omission in violation of a duty owed to the plaintiff. No action for negligence will lie without a duty broken."). "Where the undisputed material facts do not establish the existence of a duty, summary judgment is appropriate." *Kazanoff v. United States*, 753 F.Supp. 1056, 1059 (E.D.N.Y.1990). *See also Gylten v. Swalboski*, 246 F.3d 1139, 1144–45 (8th Cir.2001) ("[W]e conclude that the grant of summary judgment was proper. Absent a duty, there can be no breach, and thus, no basis for recovery under a negligence theory."). *Cf. Ads–Anker Data Systems–Midwest, Inc.*, 498 F.2d 517, 519 (4th Cir.1974) (applying West Virginia law) ("Had appellants' injuries allegedly resulted from defective brakes or tires, summary judgment would have been appropriate, for, absent special contract, an employer ordinarily has no duty to inspect and no power to control the maintenance of an employee's automobile."). Because "[s]ummary judgment is not a remedy to be exercised at the circuit court's option; [but] must be granted when there is no genuine disputed issue of a material fact[,]" *Powderidge Unit Owners Association v. Highland Properties, Ltd.*, 196 W.Va. 692, 698, 474 S.E.2d 872, 878 (1996), the circuit court's grant of summary judgment to the Board should be affirmed.

2. The question of the existence of a legal duty is a question of law. The existence of a legal duty is not a question of fact; it is an issue of law. As an issue of law, its resolution resides in the province of the court—not the jury.

The determination of whether a defendant in a particular case owes a duty to the plaintiff is not a factual question for the jury; rather the determination of whether a plaintiff is owed a duty of care by a defendant must be rendered by the court as a matter of law.

Syl. pt. 5, *Aikens v. Debow*, 208 W.Va. 486, 541 S.E.2d 576. I believe that, even taking Mr. Elliott's factual averments in a light most favorable to him, he has failed to show a legal duty. *See, e.g., Gooch v. West Virginia Dep't of Pub. Safety*, 195 W.Va. 357, 366, 465 S.E.2d 628, 637 (1995) ("A central issue to the circuit court's determination is whether the record taken as a whole and in a light most favorable to the plaintiff is sufficient to create a genuine issue of material fact for trial.").

Summary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.

Syl. pt. 2, *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995).

B. *The Board was Under No Legal Duty to Police a Non-school Party, Occurring After School Hours on a Private Premises, Which was Not Organized Nor Sponsored by Nitro High School*

Mr. Elliott seeks to impose liability upon the Board because the "victory party" was an extension of the championship football game. He bases his claim upon W. Va.Code § 18–2–25 (1967) (Repl.Vol.1999) which provides, in pertinent part, that "[t]he county boards of education are hereby granted and shall exercise the control, supervision and regulation of all interscholastic athletic events, and other extracurricular activities of the students in public secondary schools, and of said schools of their respective counties." Mr. Elliott attempts to ratchet the victory party into the term "extracurricular activ[ity]." In short, Mr. Elliott's theory against the Board

contends that the "victory party," because of its connection with the state high school football championship, was ... an extracurricular activity. [Mr. Elliott] alleges that teachers at the school knew of the party beforehand, and that several coaches even attended the party and drank alcoholic beverages with students. [Mr. Elliott] argues that the Board had a duty to intervene and prevent students from drinking alcoholic beverages.

However, it is undisputed that neither the Board nor Nitro High School organized the victory party, transported students to the victory party, allowed the victory party to occur on school property or permitted the victory party to occur during school hours. "Schools have generally not been held to have a duty of supervision when the injuries have occurred off-campus while students have been involved in non-school related activities." 57 Am.Jur.2d *Municipal, County, School, and State Tort Liability* § 510, at 474 (2001) (footnote omitted).

Indeed, the inappropriateness of creating a legal duty in this case (the obverse of the appropriateness of granting summary judgment) is evidenced by reference to our opinion in *Miller v. Whitworth*, 193 W.Va. 262, 455 S.E.2d 821 (1995), where we reiterated the parameters for creating a legal duty. "[F]oreseeability of risk is an important consideration.... This Court also acknowledged that courts should consider the 'likelihood of injury, the magnitude of the burden of guarding against it, and the consequences of placing that burden on the defendant.'" *Id.*, 193 W.Va. at 266, 455 S.E.2d at 825 (citations omitted). Application of this test to the facts in the record before this Court establishes that the circuit court appropriately granted the Board summary judgment.

For example, in *Rollins v. Blair*, 235 Mont. 343, 767 P.2d 328 (1989), Rollins was a cheerleader for Fergus County High School (hereinafter "Fergus"). The Fergus cheerleading squad attended a cheerleading camp. Rollins was practicing with other Fergus cheerleaders during a free period before the camp's evening activities. While practicing, Rollins fell from an off-the-ground position, injuring her spine.

Rollins sued the school district alleging responsibility for its students during school, during extracurricular activities and as principal of its agent, LaVonne Simonfy (the cheerleading advisor) for negligent supervision. The trial court granted Fergus summary judgment and held that the school district had no active part in the summer cheerleading camp with the exception of providing a bus for transportation. On appeal, Rollins argued that Fergus played an active role in sending the cheerleaders to camp and that Fergus sent LaVonne Simonfy to the camp as an advisor and thus was liable for Simonfy's negligence for improper supervision. In affirming the summary judgment, the Montana Supreme Court said:

Appellant asserts that Fergus owed a duty because of its active participation in the events leading up to the injury at the camp. For example, the cheerleaders were selected by the students and faculty of Fergus. Money was raised for the camp and deposited in the school district accounts. The cheerleaders also learned of the camp through literature sent ... to the school.

On the motion for summary judgment, Fergus showed that it merely provided a bus for the girls' transportation. The funds which were raised to send the cheerleaders to the camp were private funds raised by the girls themselves. To hold the school district liable for injuries to a cheerleader simply because she was chosen by other students of the school is insufficient to find a duty. Moreover, posters advertising the camp provided by Blair is also insufficient to find that Fergus owed a duty to Rollins. The cheerleading camp was run by private parties independent of the school district. It would be improper to hold that Fergus had a duty of supervision to Rollins for an extracurricular activity during the summer months which was governed by independent parties.

235 Mont. at 346, 767 P.2d at 330.

Moreover, the court also rejected imputed liability:

Appellant contends that Fergus is liable to Rollins through its agent, LaVonne Si-

monfy. However, Simonfy's participation was too limited to owe a duty as a supervisor and was not Fergus's agent. She was not under contract with the school district during the summer months and when she attended the camp. She used her own funds to attend the camp rather than accept school funds to attend. Her attendance at the camp was personal and not as an employee of Fergus.

*Id.* at 347, 767 P.2d at 330.

Like Ms. Simonfy, the participation of the coaches in the victory party was simply too tenuous to impute liability to the Board. Summary judgment was appropriately entered in the Board's favor.

Further, even if the victory party was connected with some school organization, it was still held off school grounds and after school hours; thus, no duty of supervision (and, perforce, no negligence) exists. "Where an injury occurs in connection with club initiation ceremonies off school premises and outside school hours, no duty of supervision has been found in the absence of evidence that the activity was school-sponsored and school-directed so as to establish a school-pupil relationship with respect thereto." 57 Am. Jur.2d *Municipal, County, School, and State Tort Liability* § 501, at 463–64 (2001) (footnote omitted). Thus, I cannot conclude the Board had any duty in this case and I conclude summary judgment was appropriately entered.

Imposition of liability in this case opens a multitude of perplexing practical problems, such as—what was the Board's proper response to the victory party? Did it have the duty to seek an injunction to prevent a non-school related party occurring on private property after school hours? Did it have the obligation to send security guards to all such social events to enforce a no drinking policy? Did it have the obligation to formally advise students not to attend and coerce student compliance upon threatened imposition of sanction if any student violated the school's dictate to avoid attending a private, non-school related, off-school property, after school hours party?

Even assuming sound, workable and legally supportable answers to these difficult questions are forthcoming, this Court has said that necessary areas of inquiry in establishing a legal duty include "the magnitude of the burden of guarding against it, and the consequences of placing that burden on the defendant." *Eastern Steel Constructors, Inc. v. City of Salem,* 209 W.Va. 392, 397, 549 S.E.2d 266, 271 (2001) (citations omitted).

Each year in West Virginia, our public schools sponsor numerous extracurricular activities such as sporting events, field trips, social dances, senior proms, baccalaureates and graduation ceremonies. If school boards are compelled to eliminate underage drinking during private, non-school related activities occurring on private property *after* school events end, boards would have to divert finite resources away from educational programs and usurp the primary responsibility of parents in supervising their children. Schools do not have such a duty.

As the Florida Court of Appeals has explained:

[A] school has no duty to supervise off-campus, non-school related activities occurring during non-school hours. Any holding to the contrary would essentially make school officials insurers of all students' safety until the students return home each day. We decline to place such an unreasonable and onerous burden on school officials.

*Concepcion v. Archdiocese of Miami,* 693 So.2d 1103, 1105 (Fla.Ct.App.1997).

"The logical point at which a school's obligation of reasonable supervision ends and a parent or guardian's duty of supervision resumes is the point at which the student leaves the school's premises during non-school hours and is no longer involved in school-related activities." 47 Am.Jur.2d *Municipal, County, School, and State Tort Liability* § 510, at 474 (2001) (citing *Concepcion,* 693 So.2d 1103). The supervisory duty obligation ceases once the extracurricular activity ends—as it did here once the football game ended. Any other rule would impose on our school systems an intolerable burden to achieve an unreasonable objective.

For the foregoing reasons, I respectfully dissent. I am authorized to state that Jus-

tice Maynard joins me in this separate opinion.