608 S.E.2d 191

**Janice Sharon DRAKE, as Administratrix of the Estate of Nannie Hager, Plaintiff Below, Appellant,**

v.

**Richard SNIDER and State Farm Mutual Automobile Insurance Company, Defendants Below, Appellees.**

No. 31655.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 29, 2004.

Decided Nov. 12, 2004.

**576**

Christopher J. Heavens, Esq., Heavens Law Offices, Charleston, for Appellant.

Charles S. Piccirillo, Esq., Kelly R. Charnock, Esq., Shaffer & Shaffer, Madison, for Appellees.

PER CURIAM.

Janice Sharon Drake, as the Administratrix of the estate of Nannie Hager, appellant/plaintiff below, (hereinafter "Ms. Drake") appeals from an order of the Circuit Court of Mingo County granting summary judgment in favor of Richard Snider[1] and State Farm Mutual Automobile Insurance Company (hereinafter "State Farm"), appellees/defendants below. Ms. Drake makes two assignments of error: (1) discovery was needed prior to deciding State Farm's summary judgment motion, and (2) the circuit court misunderstood the law applicable to a bad faith claim under W. Va.Code § 33–11–4(9). After a careful review of the briefs and record, the circuit court's order granting summary judgment is reversed.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

Nannie Hager died as the result of injuries received in a car accident in Boone County, West Virginia, on October 30, 2000. At the time of the accident, Ms. Hager was riding as a passenger in a car that was driven by Claude Halstead. The accident was attributed to the driver of another car, Laura Lee Muncy. When the accident occurred, Ms. Muncy was fifteen years old.[2] The car being driven by Ms. Muncy was owned by her stepfather, William White. Mr. White was insured by State Farm.

Subsequent to Ms. Hager's death, Ms. Drake filed a wrongful death claim in 2001 against Ms. Muncy and others. During the pendency of the action, Ms. Drake learned that Ms. Muncy's biological father, Willard Muncy (hereinafter "Mr. Muncy"), also had two vehicles insured with State Farm.[3] Consequently, on February 27, 2002, Ms. Drake filed a separate action which is the focus of this appeal against State Farm. This new action alleged that Ms. Drake was entitled to liability coverage under Mr. Muncy's policies.[4] The new action also asserted that State Farm acted in bad faith by failing to disclose Mr. Muncy's policies.

In October of 2002, Ms. Muncy settled the wrongful death claim with Ms. Drake. In that settlement agreement, Ms. Muncy agreed to a stipulated judgment against her in the amount of $800,000. Ms. Muncy further agreed to assign any rights she had against State Farm to Ms. Drake, so long as Ms. Drake did not execute the stipulated judgment against her. In July of 2003, the circuit court entered an order approving the wrongful death settlement and dismissed the action.

On October 11, 2002, and prior to the dismissal of the wrongful death action, State Farm filed a motion for summary judgment in the separate action against State Farm. In its motion, State Farm asserted that Ms. Muncy did not qualify as an insured under Mr. Muncy's policies. Alternatively, should Ms. Muncy qualify as an insured, there was still no coverage because the car she was driving did not qualify for coverage under

---

1. Mr. Snider is a claim representative for State Farm.

2. Ms. Muncy's mother was in the car as a passenger when the accident occurred.

3. After Ms. Drake learned of Mr. Muncy's policies, State Farm advised Ms. Muncy that there may not be coverage for her under Mr. Muncy's

policies. As a result of this conflict, State Farm terminated its representation of Ms. Muncy in the wrongful death claim.

4. Each of Mr. Muncy's policies provided per person/per occurrence liability limits of $50,000/ $100,000.

the policies. Ms. Drake filed a response to the motion for summary judgment wherein she argued that she needed time to conduct discovery. Pursuant to Rule 56(f) of the West Virginia Rules of Civil Procedure, Ms. Drake attached an affidavit to her response. After a hearing on the motion, the circuit court entered an order on March 14, 2003, granting summary judgment to State Farm. From this ruling, Ms. Drake now appeals.

## II.

## STANDARD OF REVIEW

This matter involves an order awarding summary judgment to State Farm. The standard for review in this context is well established. "A circuit court's entry of summary judgment is reviewed de novo." Syl. pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). We have held that "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. pt. 3, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963). As to the circuit court's denial of Ms. Drake's Rule 56(f) motion for discovery, "[a] trial court's decision not to allow further discovery under Rule 56(f) is reviewed on appeal for an abuse of discretion." Franklin D. Cleckley, et al., *Litigation Handbook on West Virginia Rules of Civil Procedure*, § 56(f), at 104 (Supp.2004) (citing *United States v. Kitsap Physicians Serv.*, 314 F.3d 995 (9th Cir.2002)). Mindful of these standards, we proceed to the merits of this appeal.

## III.

## DISCUSSION

### A. Discovery Was Necessary Prior to Deciding State Farm's Summary Judgment Motion

The first issue raised by Ms. Drake is that the circuit court erred by granting summary judgment based upon her Rule 56(f) affidavit wherein she indicated the need for discovery in order to resist the summary judgment motion.[5] In Syllabus point 3 of *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995), we addressed the burden on a party opposing a motion for summary judgment:

> If the moving party makes a properly supported motion for summary judgment and can show by affirmative evidence that there is no genuine issue of a material fact, the burden of production shifts to the nonmoving party who must either (1) rehabilitate the evidence attacked by the moving party, (2) produce additional evidence showing the existence of a genuine issue for trial, or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f) of the West Virginia Rules of Civil Procedure.

*See* Syl. pt. 3, in part, *Crain v. Lightner*, 178 W.Va. 765, 364 S.E.2d 778 (1987) ("Where a party is unable to resist a motion for summary judgment because of an inadequate opportunity to conduct discovery, that party should file an affidavit pursuant to W. Va. R.Civ.P. 56(f) and obtain a ruling thereon by the trial court."). It has been recognized that "[s]ummary judgment is appropriate only after the opposing party has had adequate time for discovery." Cleckley, *Litigation Handbook*, § 56(f), at 944 (2002). We have also noted that "a decision for summary judgment before discovery has been completed must be viewed as precipitous." *Board of Educ. of the County of Ohio v. Van Buren & Firestone Architects, Inc.*, 165 W.Va. 140, 144, 267 S.E.2d 440, 443 (1980).

Here, the issue of discovery is slightly complicated. The underlying wrongful death case was pending when the bad faith case was filed. It appears from the record that discovery was indeed conducted in the wrongful death action. Further, it appears

---

5. Rule 56(f) provides as follows:

Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

that a scheduling conference was held in the bad faith case, and dates were set for discovery and other matters. However, for reasons unclear from the record, the circuit court never actually entered a scheduling order in the bad faith case.[6]

Notwithstanding the fact that a scheduling order was not entered, State Farm contends that the parties were on notice of the discovery cutoff dates as they were mentioned during the scheduling conference. In contrast, Ms. Drake contends that no discovery was conducted in the bad faith case because the wrongful death action was being litigated first. Additionally, Ms. Drake contends that about the time a settlement was reached in the wrongful death action, she attempted to engage in discovery by deposing defendant Richard Snider. However, State Farm failed to make Mr. Snider available.

Because no discovery actually took place in the bad faith case, the factual evidence relied upon by the circuit court to grant summary judgment was taken from evidence produced during the wrongful death action. Although it was perfectly appropriate for the circuit court to consider such evidence, we are disturbed by the fact that the circuit court failed to grant Ms. Drake's Rule 56(f) motion to specifically conduct discovery in the bad faith case. Of course, we are also mindful that, during a scheduling conference, dates were set out for discovery. However, absent entry of a scheduling order, the discovery requirements were never formalized. Indeed, we have cautioned that "[u]nder Rule 16(b), it is mandatory that trial courts enter a scheduling order that limits the time to join parties, amend pleadings, file and hear motions, and complete discovery."[7] *State ex rel. Pritt v. Vickers,* 214 W.Va. 221, 226, 588

S.E.2d 210, 215 (2003) (footnote added) (citing *Elliott v. Schoolcraft,* 213 W.Va. 69, 73 n. 5, 576 S.E.2d 796, 800 n. 5 (2002)) (reversing summary judgment because circuit court failed to enter scheduling order). Because no scheduling order was entered in this case, we find that trial court abused its discretion by denying Ms. Drake's Rule 56(f) motion to conduct discovery in the bad faith case.[8]

Although we have determined that this case must be reversed to permit Ms. Drake to engage in discovery, we must nevertheless address the merits of the trial court's decision to grant summary judgment based upon the evidence that was produced in the underlying wrongful death case.

### B.   Ms. Muncy's Residence

The circuit court ruled that the evidence clearly demonstrated that Ms. Muncy was not an insured under Mr. Muncy's policies because she did not reside at his home. The relevant language in Mr. Muncy's policies defined an "insured" to include a "relative." A "relative" is defined as "a person related to you or your spouse by blood, marriage or adoption who resides primarily with you. It includes your unmarried and unemancipated child away at school." Based upon this provision, the circuit court determined that Ms. Muncy was not an insured under the policies because she was living in her mother's home at the time of the accident. Ms. Drake argued that this issue was in dispute and that she needed to take the depositions of Ms. Muncy's father, mother and step-father. *See* Syl. pt. 5, *Farmers Mut. Ins. Co. v. Tucker,* 213 W.Va. 16, 576 S.E.2d 261 (2002) ("Because a determination of residency depends on the intent of the parties, it is typically a question of fact that cannot be determined through a motion for

---

**6.** Ms. Drake did not make a specific assignment of error of the fact that no scheduling order was entered as required by Rule 16(b) of the West Virginia Rules of Civil Procedure.

**7.** Rule 16(b) requires the entry of a scheduling order. Specifically the rule states in relevant part:

> (b) ... [T]he judge shall, after consulting with the attorneys for the parties and any unrepresented parties, by a scheduling conference, telephone, mail or other suitable means, enter a scheduling order that limits the time:

> (1) To join other parties and to amend the pleadings;
> (2) To file and hear motions; and
> (3) To complete discovery.

**8.** We reject State Farms contention that the Rule 56(f) affidavit was conclusory and failed to meet the requisite specificity required by the rule. Insofar as no discovery was actually conducted in this case, the affidavit submitted by Ms. Drake was sufficient.

summary judgment."). Although Ms. Drake sought to have discovery on the issue of Ms. Muncy's residency under the above provision, we do not believe such discovery was necessary solely for that purpose because the dispositive language in the policies was the term "school."

■ The record does not indicate that the circuit court specifically examined the term "school" as it was used in the subject policies, however, we are obligated to do so. This Court has held that "[t]he interpretation of an insurance contract, including the question of whether the contract is ambiguous, is a legal determination that, like a lower court's grant of summary judgement, shall be reviewed de novo on appeal." Syl. pt. 2, *Riffe v. Home Finders Assocs., Inc.*, 205 W.Va. 216, 517 S.E.2d 313 (1999). For the purposes of the facts in this case, we find the term "school" to be ambiguous. This Court has held that "[i]t is well settled law in West Virginia that ambiguous terms in insurance contracts are to be strictly construed against the insurance company[.]" Syl. pt. 4, in part, *National Mut. Ins. Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 356 S.E.2d 488 (1987). *See also Horace Mann Ins. Co. v. Leeber*, 180 W.Va. 375, 378, 376 S.E.2d 581, 584 (1988) ("[A]ny ambiguity in the language of an insurance policy is to be construed liberally in favor of the insured, as the policy was prepared exclusively by the insurer.").

Simply put, the term "school" was not defined by the policies. Such omission is fatal under the facts of this case because the term "school" has various meanings. For example, the term "school" is defined in the dictionary, in part, as follows: "a place or institution for teaching and learning; establishment for education; specific, (a) an institution for teaching children, (b) a place for training and instruction in some special field, skill, etc. [a dancing school], (c) a college or university[.]" Webster's New World Dictionary of American English, at 1201 (3rd ed.1988). Under Webster's definition, the term "school" encompasses an elementary school, junior high school, high school, trade

school, college and university. The policies at issue in the instant case do not impose any limitation on the term "school." Therefore, we must construe the policies to encompass all of its possible meanings.

The facts in the case clearly reveal that Ms. Muncy's parents were divorced when she was two years old. Custody of Ms. Muncy was initially granted to her mother. However, when Ms. Muncy turned twelve, Mr. Muncy petitioned for her custody, which was granted. When Ms. Muncy turned fifteen years of age, she wanted to change high schools. Consequently, Mr. Muncy permitted her to live with her mother for the purpose of attending a different high school. Legal custody of Ms. Muncy remained with her father. Ms. Muncy had been living in her mother's home for only a few months prior to the accident in this case. These facts establish that Ms. Muncy was (1) an unemancipated child, (2) whose legal custody was with her father and (3) that she left her father's home for the purpose of attending a different high school.[9]

Under the language of Mr. Muncy's policies, coverage is provided for a relative who is an "unmarried and unemancipated child away at school." It is clear to this Court that Ms. Muncy met this definition of a relative because the term "school" was neither defined nor limited. Therefore, the mere fact that Ms. Muncy left her father's home to attend a high school near her mother's home, and to live with her mother while attending that school, did not alter the fact that she was an "unemancipated child away at school." Consequently, the trial court was clearly wrong in finding that Ms. Muncy was not an insured under this provision of her father's policies.

### C. Definition of Non–Owned Car

■ The circuit court found, as an alternative basis for granting summary judgment, that the car Ms. Muncy was driving did not qualify as a "non-owned car" under Mr. Muncy's policies. Under Mr. Muncy's policies, coverage was provided for a non-owned car if

---

9. During oral argument, the Court was informed that Ms. Muncy had returned to her father's home.

it met the policy definition of a non-owned car. The policies defined a "non-owned car" as follows:

> Non–Owned Car—means a car not owned, registered or leased by:
>
> 1. you, your spouse;
> 2. any relative unless at the time of the accident or loss:
>
>     a. the car currently is or has within the last 30 days been insured for liability coverage; and
>
>     b. the driver is an insured who does not own or lease the car;
>
> 3. any other person residing in the same household as you, your spouse or any relative; or
> 4. an employer of you, your spouse or any relative.

■ The purpose of a non-owned car provision "is to provide protection to the insured for the occasional or infrequent use of [a] vehicle not owned by him or her and is not intended as a substitute for insurance on vehicles furnished for the insured's regular use." *New York Cent. Mut. Fire Ins. Co. v. Jennings,* 195 A.D.2d 541, 600 N.Y.S.2d 486, 487 (1993). The circuit court found the definition of "non-owned car" to be "clear and unambiguous." In doing so, the circuit court relied upon the language in section 3 as precluding coverage. This section excludes coverage for a car owned by someone living in the same household of an insured. Consequently, the circuit court ruled that because Ms. Muncy's step-father owned the car and Ms. Muncy was living in his home while attending school, no coverage extended to Ms. Muncy. We are not persuaded by the circuit court's reasoning because it is premised upon finding the definition of non-owned car to be unambiguous. We believe the definition is, in fact, ambiguous.

The ambiguity we find in the definition of "non-owned car" is the term "household." A case that illustrates this point is *State Farm Mutual Automobile Insurance Co. v. McGee,* 759 So.2d 358 (Miss.1999).[10] The underlying facts of *McGee* indicated that a minor named Perry McGee was a passenger in a truck when he was injured. The truck in which Perry was injured was being driven by his cousin, a minor named Jacob McGee. The truck was owned by Jacob's stepfather. Jacob's parents were divorced. At the time of the accident, Jacob's father, Harlon McGee, had legal custody of him. However, Jacob also resided "with his mother and stepfather . . . for visitation at various times throughout the year." *McGee,* 759 So.2d at 359 (Waller, J., concurring). Perry sued Jacob and his father, Harlon, seeking to recover damages under Harlon's automobile policy. Harlon's insurer, State Farm, filed a declaratory judgment action seeking a determination that there was no coverage under Harlon's policy. The critical issue raised by State Farm was that the truck driven by Jacob was not a non-owned car under the policy. Therefore, coverage was excluded. The relevant part of the non-owned car provision of the policy was exactly the same policy as that in the instant case.[11]

The trial court in *McGee* found "that the term 'same household' with no further definition in the policy is ambiguous and subject to two interpretations." *McGee,* 759 So.2d at 362 (Prather, J., dissenting). In resolving the ambiguity, the trial court found that Jacob "was a resident of his stepfather's 'house' but nevertheless concluded that they were not members of the same 'household.' " *Id.* The trial court therefore dismissed the declaratory judgment action. State Farm appealed to the Supreme Court of Mississippi which affirmed the lower court's ruling. The concurring opinion of Justice Waller who

---

**10.** The majority opinion in *McGee* was terse and did not include relevant factual information. However, the concurring and dissenting opinions did set out all the relevant facts and will therefore be relied upon when quotations are used.

**11.** The relevant part of the policy at issue in the *McGee* case stated:

> Non–Owned Car—means a car not owned, registered or leased by:

> 1. You, your spouse;
> 2. Any relative . . .;
> 3. Any other person residing in the same household as you, your spouse or any relative; or
> 4. An employer of you, your spouse or any relative.

*McGee,* 759 So.2d at 361 (Prather, J. dissenting).

joined by four other justices, set out the rationale for the Supreme Court's decision:

State Farm argues that when [Jacob] is driving [his stepfather's] truck, a vehicle obviously not listed on Harlon's policy ..., he is not insured because [the stepfather's] truck is not a "not-owned" vehicle. In other words, [the stepfather's] truck is a vehicle owned by a member of Harlon's household which is not listed on Harlon's policy and, therefore, not covered.

State Farm's argument is disingenuous at best. To find that [the] truck is a "non-owned" vehicle, the Court would have to hold that Harlon's household is expanded to include anyone with whom Harlon's spouse or relatives might periodically reside.

Common sense dictates that the insured's "household" includes the insured, the insured's spouse, if the spouse is living with or dependent upon the insured, and the insured's relatives, if they are living with or dependent upon the insured. [Jacob] is an insured under the policy because he is Harlon's son and because he lives under the same roof as Harlon. A person who does not live with or is not dependent upon Harlon does not become a member of Harlon's household merely because Harlon's son might temporarily reside with him and drive his vehicle.

. . . .

Under Mississippi law, an unemancipated minor is a member of two households when his parents are living separately. However, just because the minor is a member of two households does not mean that the other members of those two households are members of both or that the two households become one.

*McGee,* 759 So.2d at 359–58 (Waller, J., concurring).

Although Justice Waller did not conceptualize the meaning of household in terms of residence and domicile, this was, in fact, the essence of his analysis. In the case *sub judice,* whose facts are identical to those of the McGee case, the question of whether Ms. Muncy was a member of her father's household boils down to a determination of her domicile. This Court stated, in *Lotz v. Atamaniuk,* 172 W.Va. 116, 118, 304 S.E.2d 20, 23 (1983), that "[d]omicile and residence are not synonymous. A man may have several residences, but only one domicile." In fact, we held in Syllabus point 2 of *Lotz* that "[d]omicile is a combination of residence (or presence) and an intention of remaining. If domicile has once existed, mere temporary absence will not destroy it, however long continued." Thus, in this context, it is quite clear that the court in *McGee* concluded that Jacob had two residences, but his domicile was with his father. Consequently, the court in *McGee* implicitly defined household to mean domicile. Therefore, the truck driven by Jacob was a non-owned vehicle because no one in Jacob's domicile owned the truck. *See Menard v. Zeno,* 558 So.2d 744 (La.Ct.App. 1990) (finding that a minor who lived with his grandmother for a year was a member of his parent's household because there was no legal action taken to change his domicile).[12]

---

**12.** This Court also recently commented on this precise issue in *Farmers Mutual Insurance Co. v. Tucker,* 213 W.Va. 16, 576 S.E.2d 261 (2002):

Similarly, courts analyzing the word "household" in insurance policies have usually concluded that the question of whether a household exists is one of fact, not law. One court found the term "household" to be "a chameleon like word," *Cobb v. State Security Ins. Co.,* 576 S.W.2d 726, 738 (Mo.1979), while another found that the "terms have no absolute meaning. Their meaning may vary according to the circumstances." *Cal–Farm Ins. Co. v. Boisseranc,* 151 Cal.App.2d 775, 781, 312 P.2d 401, 404 (Cal.App.1957). A New Jersey court stated:

Household is not a word of art. Its meaning is not confined within certain commonly known and universally accepted limits. True, it is frequently used to designate persons related by marriage or blood, who dwell together as a family under a single roof.... But it has been said also that members of a family need not in all cases reside under a common roof in order to be deemed a part of the household. *Mazzilli v. Acc. & Cas. Ins. Co. of Winterthur, Switzerland,* 35 N.J. 1, 8, 170 A.2d 800, 804 (1961).

*Tucker,* 213 W.Va. at 22, 576 S.E.2d at 267. Reaching the merits in this case, we held, in *Tucker,* that a named insured's adult son, who lived in a separate mobile home on the named insured's property, did not automatically mean that the son was not a member of the named insured's household.

■ Based upon the foregoing, we find that the word "household" in Mr. Muncy's policies is ambiguous because it could refer to either residence or domicile. This Court has made clear that "[w]hen the words of an insurance policy are, without violence, susceptible of two or more interpretations, that which will sustain the claim and cover the loss must be adopted." Syl. pt. 2, *Farmers Mut. Ins. Co. v. Tucker*, 213 W.Va. 16, 576 S.E.2d 261 (2002). In view of our controlling law on ambiguity in insurance policies, we find that the term "household" can fairly be interpreted to mean domicile under the circumstances of the instant case. We further find that, because legal custody of Ms. Muncy was with Mr. Muncy, her domicile was with him. *See Taylor v. State Farm Mut. Auto. Ins. Co.*, 248 La. 246, 178 So.2d 238, 242 (1965) ("Even though a . . . child might have several residences, despite the fact that he has one domicile, the legal residence of an unemancipated minor . . . is that of his [custodial parent] unless changed by law. This is reasonable and understandable because . . . the [custodial parent] has numerous obli-

gations to [the] child [including his support and maintenance], is vested with parental authority, and is responsible in great measure for his actions."). Consequently, the vehicle that Ms. Muncy was driving qualified as a non-owned car under the policies because it was clearly not owned by anyone residing in her domicile.[13]

## IV.

## CONCLUSION

In view of the foregoing, the circuit court's order granting summary judgment to State Farm is reversed, and this case is remanded for further disposition consistent with this opinion.

Reversed and Remanded.

---

13. We need not address Ms. Drake's last assignment of error because we have found that cover-

age is available under Mr. Muncy's policies.